**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, <br><br>            Plaintiff, <br><br>      v. <br><br>COLUCID PHARMACEUTICALS, INC., THOMAS P. MATHERS, ART PAPPAS, MARTIN EDWARDS, ALISON LAWTON, MARK CORRIGAN, LUC MARENGERE, MARVIN WHITE,  ELI LILLY AND COMPANY,  and  ProCar ACQUISITION CORPORATION, <br><br>            Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No.  17-10197 <br><br>JURY TRIAL DEMANDED <br><br>CLASS ACTION |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on January 18, 2017 (the "Proposed Transaction"), pursuant to which CoLucid Pharmaceuticals, Inc. ("CoLucid" or the "Company") will be acquired by Eli Lilly and Company ("Parent") and ProCar Acquisition Corporation ("Merger Sub," and together with Parent, "Eli Lilly") through a tender offer currently set to expire on February 28, 2017 (the "Tender Offer").

2. On January 17, 2017, CoLucid's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Eli Lilly.  Pursuant to the terms of the Merger Agreement, shareholders of

CoLucid will receive $46.50 in cash for each share of CoLucid common stock.

3.      On January 31, 2017, defendants filed a Solicitation/Recommendation Statement (the "Solicitation Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Solicitation Statement omits material information with respect to the Proposed Transaction, which renders the Solicitation Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of CoLucid common stock.

9. Defendant CoLucid is a Delaware corporation and maintains its principal executive offices at 222 Third Street, Cambridge, Massachusetts 02142. CoLucid's common stock is traded on the NasdaqGM under the ticker symbol "CLCD."

10. Defendant Thomas P. Mathers ("Mathers") has served as a director and Chief Executive Officer ("CEO") of CoLucid since 2011.

11. Defendant Art Pappas ("Pappas") is a director and Chairman of the Board of CoLucid. According to the Company's website, Pappas is Chair of the Nominating & Corporate Governance Committee and a member of the Compensation Committee. Eli Lilly owns a non-controlling limited liability company membership interest, which represents approximately 29% of the economic interest, in a fund of funds that owns non-controlling limited partnership interests in investment funds that own Company shares, including a non-controlling limited partnership interest, which represents approximately 12% of the economic interest, in A.M. Pappas Life Science Ventures III, L.P. ("Pappas Life Science Ventures"). Pappas is the Managing Partner of Pappas Capital, LLC ("Pappas Capital"), which manages a series of venture capital funds, including Pappas Life Science Ventures, and Pappas has an ownership interest in such fund. Pappas Life Science Ventures and Pappas Capital have entered into tender and support agreements, pursuant to which they have agreed to tender their Company shares in the Tender Offer.

12. Defendant Martin Edwards ("Edwards") is a director of CoLucid. According to the Company's website, Edwards is a member of the Audit Committee and the Nominating & Corporate Governance Committee.

13. Defendant Alison Lawton ("Lawton") is a director of CoLucid. According to the Company's website, Lawton is a member of the Audit Committee.

3

14. Defendant Mark Corrigan ("Corrigan") is a director of CoLucid. According to the Company's website, Corrigan is Chair of the Compensation Committee.

15. Defendant Luc Marengere ("Marengere") is a director of CoLucid. According to the Company's website, Marengere is a member of the Compensation Committee and the Nominating & Corporate Governance Committee. Eli Lilly owns a non-controlling limited partnership interest, which represents approximately 38% of the economic interest, in TVM Life Science Ventures VII, L.P. ("TVM Life Science Ventures"). Marengere is a managing partner of TVM Capital Life Science, which, among other things, advises TVM Life Science Ventures. TVM Life Science Ventures has entered into a tender and support agreement, pursuant to which it has agreed to tender its Company shares in the Tender Offer.

16. Defendant Marvin White ("White") has served as a director of CoLucid since July 2015. According to the Company's website, White is Chair of the Audit Committee.

17. The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18. Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

19. Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of CoLucid (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21. This action is properly maintainable as a class action.

22. The Class is so numerous that joinder of all members is impracticable. As of January 12, 2017, there were approximately 19,284,290 shares of CoLucid common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

**SUBSTANTIVE ALLEGATIONS**

*Background of the Company and the Proposed Transaction*

27.     CoLucid was founded in 2005 and is developing lasmiditan oral tablets for the acute treatment of migraine headaches in adults, and intravenous lasmiditan for the acute treatment of headache pain associated with migraine in adults in emergency room and other urgent care settings.

28.     Lasmiditan has been designed for the acute treatment of migraine headaches in adults without the vasoconstrictor activity associated with previous generations of migraine therapies.  It selectively targets 5-HT1F receptors expressed in the trigeminal pathway. Lasmiditan has been given the generic stem name "ditan," which distinguishes it from other drug classes, including triptans, the current standard of care for migraine.

29.     On December 16, 2005, pursuant to a development and license agreement, CoLucid in-licensed from Eli Lilly the exclusive, worldwide rights to make, use, and sell the active pharmaceutical ingredient in lasmiditan and products containing that ingredient.  In exchange, CoLucid, among other things, made a cash payment to Eli Lilly, issued Company shares to Eli Lilly, undertook milestone and royalty payment obligations to Eli Lilly, and granted Eli Lilly the right to appoint an "observer" to the Board, which right Eli Lilly exercised until mid-2014.  Pursuant to the development and license agreement, CoLucid also provided Eli Lilly with regular updates on the development of lasmiditan, allowing Eli Lilly the opportunity to acquire the Company at the time most advantageous to Eli Lilly.

30.     Today, CoLucid is enrolling patients in a second pivotal Phase 3 clinical trial of lasmiditan oral tablets, SPARTAN.  The objective of SPARTAN is to evaluate the safety and efficacy of lasmiditan (50 mg, 100 mg, and 200 mg) in comparison to placebo two hours after

dosing on freedom from migraine headache pain, which is the primary endpoint, and on freedom from the most bothersome associated symptom of migraine (nausea, phonophobia, or photophobia), which is the key secondary endpoint. SPARTAN is a randomized, double-blind, placebo-controlled parallel group study. The study is expected to treat a single migraine in up to 2,226 migraine patients with lasmiditan at approximately 140 sites in the United States, United Kingdom, and Germany. CoLucid expects that migraine patients enrolled in SPARTAN will include those who also have one or more cardiovascular risk factors, stable cardiovascular disease, or known coronary artery disease ("CAD"). CoLucid has obtained a Special Protocol Assessment ("SPA") agreement from the U.S. Food and Drug Administration ("FDA") for SPARTAN. Top-line results from SPARTAN are expected in the second half of 2017.

31. CoLucid is also currently enrolling patients in GLADIATOR, a Phase 3 long-term, open-label trial of lasmiditan. GLADIATOR's objective is to evaluate the safety and efficacy of lasmiditan (both the 100 mg and 200 mg dose) as well as resource utilization, functional outcomes, and disability. Based on the results of GLADIATOR, CoLucid intends to build an appropriate safety database to support a New Drug Application ("NDA") for lasmiditan. At the time of the NDA submission, it is anticipated that there will be more than 15,000 patient exposures to lasmiditan in the entire clinical program.

32. On September 6, 2016, CoLucid announced that it had completed its first pivotal Phase 3 clinical trial of lasmiditan oral tablets, SAMURAI, which was a randomized, double-blind, placebo-controlled parallel group study designed to evaluate the efficacy and safety of lasmiditan (100 mg and 200 mg) in comparison to placebo. Both the 100 mg and 200 mg doses of lasmiditan were efficacious on migraine headache pain freedom, the primary endpoint, and most bothersome associated symptom freedom, the key secondary endpoint, at the two-hour time

point. Both the primary and key secondary endpoints of SAMURAI conform to the FDA's draft Guidance for Industry, Migraine: Developing Drugs for Acute Treatment, issued in October 2014. Both the 100 mg and 200 mg doses of lasmiditan were also more efficacious than placebo on headache pain relief at the two-hour time point, as a rescue medication on headache pain freedom at the two-hour time point, in reducing migraine related disability at the two-hour time point, and in improving Patient Global Impression of Change. Lasmiditan was well tolerated with no significant difference in cardiovascular adverse events in patients dosed with lasmiditan versus placebo. SAMURAI is the first of two Phase 3 pivotal trials of lasmiditan, each being conducted under a SPA agreement with the FDA.

33. The very same day, following the announcement of the top-line data results of SAMURAI, Dr. Rob Conley, Eli Lilly's Development Leader and Distinguished Lilly Scholar in Neuroscience, contacted Individual Defendant Mathers, and the parties began discussing a potential strategic transaction between CoLucid and Eli Lilly.

34. Over the next several months, CoLucid and Eli Lilly negotiated the terms of the Proposed Transaction.

35. On January 17, 2017, the Board caused CoLucid to enter into the Merger Agreement.

36. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 6.6(a) of the Merger Agreement states, in relevant part:

> (a) During the Pre-Closing Period, except as permitted by Section 6.6(b), the Company shall not, and shall ensure that its directors, officers, employees, investment bankers, financial advisors, attorneys, accountants, agents and other representatives (collectively, "Representatives") do not, directly or indirectly, (i) initiate, solicit, or knowingly encourage or facilitate (including through the furnishing of any nonpublic information) the submission or announcement of any Takeover Proposal or any inquiry, indication of interest, offer or proposal that would reasonably be expected to lead to a Takeover Proposal (a "Takeover Inquiry"); (ii) participate or engage in any discussions or negotiations regarding, or furnish to any Person any information in connection with, or knowingly take any action to facilitate any inquiry or the making of any proposal that constitutes, or would reasonably be expected to lead to, any Takeover Proposal or Takeover Inquiry; (iii) approve, endorse or recommend any Takeover Proposal (or resolve or publicly propose to do any of the foregoing); or (iv) enter into any agreement, agreement in principle, letter of intent or similar document with respect to, or any Contract contemplating or otherwise relating to, any Takeover Proposal or Takeover Inquiry (other than an Acceptable Confidentiality Agreement) or accept any Takeover Proposal (or resolve or publicly propose to do any of the foregoing).

Section 6.6(c) further provides:

> (c) The Company shall and shall ensure that its Representatives immediately cease and cause to be terminated any solicitation, discussions or negotiations with any Person (other than Parent) conducted prior to the date of this Agreement that relate to any Takeover Proposal or Takeover Inquiry or any request for nonpublic information relating to the Company with respect to any Takeover Proposal or Takeover Inquiry. The Company shall also promptly terminate all physical and electronic data room access previously granted to any such Person or any of its Representatives and request the return or destruction of all confidential information provided by or on behalf of the Company to any such Person or any of its Representatives promptly after the date of this Agreement.

37. Further, the Company must promptly advise Eli Lilly of any proposals or inquiries received from other parties. Section 6.6(b) of the Merger Agreement states, in relevant part:

> During the Pre-Closing Period, the Company shall (1) promptly (and in any event within 24 hours) advise Parent in writing of the receipt of any Takeover Proposal or Takeover Inquiry that is made or submitted by any Person during the Pre-Closing Period, (2) provide to Parent a reasonably detailed summary of the material terms and conditions thereof (including the identity of the Person making such Takeover Proposal or Takeover Inquiry) and copies of any written materials received from or on behalf of such Person relating to such Takeover Proposal or

9

Takeover Inquiry, (3) keep Parent reasonably informed of any material developments, discussions or negotiations regarding such Takeover Proposal or Takeover Inquiry (including any material modifications to the financial or other material terms and conditions of such Takeover Proposal or Takeover Inquiry) on a prompt basis (and provide copies of any written materials received from or on behalf of such Person relating to such Takeover Proposal or Takeover Inquiry) and (4) upon the request of Parent, reasonably inform Parent of the status of such Takeover Proposal or Takeover Inquiry.

38.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Eli Lilly a "matching right" with respect to any "Superior Proposal" made to the Company. Section 6.6(d) of the Merger Agreement provides, in relevant part:

> Notwithstanding anything to the contrary contained in Section 6.6(d)(i) or elsewhere in this Agreement, at any time prior to the Acceptance Time, if (I) the Company has received a bona fide written Takeover Proposal (which Takeover Proposal did not result from or arise out of or in connection with a breach of this Section 6.6) from any Person that has not been withdrawn and, after consultation with outside legal counsel and the Company Financial Advisor, the Company Board and the Special Committee have determined in good faith that such Takeover Proposal is a Superior Proposal (after giving effect to all of the revisions to the terms of this Agreement which may be offered by Parent, including pursuant to clause (C) below) or (II) there has been an Intervening Event, then (x) the Company Board or the Special Committee prior to the Acceptance Time may make a Company Adverse Change Recommendation or (y) in the case of a Superior Proposal, the Company may terminate this Agreement in accordance with Section 8.1(d) in order to enter into a Specified Agreement with respect to such Superior Proposal, in the case of each of clauses (I) and (II), if and only if: (A) the Company Board and the Special Committee have determined in good faith, after consultation with outside legal counsel and the Company Financial Advisor, that the failure to do so would be inconsistent with the Company Board's and the Special Committee's fiduciary duties to the Company's stockholders under applicable Law; (B) the Company shall have given Parent prior written notice of its intention to make a Company Adverse Change Recommendation or terminate this Agreement pursuant to Section 8.1(d) at least four Business Days prior to making any such Company Adverse Change Recommendation or termination (a "Determination Notice"), which notice shall have included (1) with respect to an Intervening Event, a description of the Intervening Event or (2) with respect to such Superior Proposal (which notice shall have included a copy of the Specified Agreement (in the case of clause

(y) above), the identity of the Person making such Superior Proposal, a summary of the terms and conditions of such Superior Proposal in accordance with, and any other information required by, Section 6.6(b)); (C)(1) the Company shall have given Parent four Business Days after Parent's receipt of the Determination Notice to propose revisions to the terms of this Agreement or make other proposals so that either (aa) such Takeover Proposal would cease to constitute a Superior Proposal or (bb) such Intervening Event would cease to warrant a Company Adverse Change Recommendation, and shall have made its Representatives available to, and negotiated in good faith with, Parent with respect to such proposed revisions or other proposals, if any, during such period, (2) at the end of such period, after considering the results of such negotiations and giving effect to such proposed revisions or other proposals made by Parent, if any, and after consultation with outside legal counsel and the Company Financial Advisor, the Company Board and the Special Committee shall have determined in good faith that such Takeover Proposal is still a Superior Proposal or such Intervening Event continues to warrant a Company Adverse Change Recommendation and, after consultation with outside legal counsel, that the failure to make such Company Adverse Change Recommendation or terminate this Agreement pursuant to Section 8.1(d) would be inconsistent with the Company Board's and the Special Committee's fiduciary duties to the Company's stockholders under applicable Law. For the avoidance of doubt, the provisions of this Section 6.6(d)(ii) shall also apply to every material amendment to any Takeover Proposal and shall require a new Determination Notice be delivered to Parent in accordance with clause (B) above, except that the "matching" period described in clauses (B) and (C) above shall be two Business Days rather than the initial four Business Day period.

39. Further locking up control of the Company in favor of Eli Lilly, the Merger Agreement provides for a "termination fee" of $34 million, payable by the Company to Eli Lilly if the Individual Defendants cause the Company to terminate the Merger Agreement.

40. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

41. Additionally, Pappas Life Science Ventures, PV III CEO Fund, LP, Pappas Capital, Novo A/S, and TVM Life Science Ventures have entered into tender and support agreements, pursuant to which they have agreed to tender their shares in the Tender Offer.

Accordingly, 34.7% of the Company's shares are already locked up in favor of the Proposed Transaction.

***The Inadequate Merger Consideration and Interests of the Company's Officers and Directors***

42. The $46.50 per share merger consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

43. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

44. Further, the merger consideration fails to adequately compensate the Company's stockholders for the significant synergies resulting from the merger.

45. The financial analyses performed by the Company's own financial advisor, MTS Health Partners, L.P. ("MTS"), confirm the inadequacy of the merger consideration. For example, MTS's *Comparable Acquisitions Analysis* yielded an implied per share value as high as *$210.00*.

46. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

47. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

48. For example, Individual Defendant Mathers stands to receive $26,723,924 as a result of the Proposed Transaction.

49. Additionally, executive officers Matthew D. Dallas and Bernice Kuca stand to receive $11,213,420 and $13,312,657, respectively.

50. Further, the same day the parties executed the Merger Agreement, the Compensation Committee of the Board approved a cash bonus for Individual Defendant Mathers in the amount of $75,000, as well as cash bonuses for three of the Company's other officers.

*The Solicitation Statement Omits Material Information, Rendering It False and Misleading*

51. Defendants filed the Solicitation Statement with the SEC in connection with the Proposed Transaction.

52. The Solicitation Statement omits material information regarding the Proposed Transaction, which renders the Solicitation Statement false and misleading.

53. The Solicitation Statement omits material information regarding CoLucid's financial projections and the financial analyses performed by MTS in support of its so-called fairness opinion.

54. With respect to CoLucid's financial projections, the Solicitation Statement fails to disclose: (i) changes in net working capital; (ii) a reconciliation of GAAP to non-GAAP metrics; (iii) total operating expenses, as well as operating expense line items, including but not limited to SG&A and R&D; and (iv) the other line items used by MTS in calculating cash flow as used in its *Discounted Cash Flow Analysis*, including but not limited to stock-based compensation expense, depreciation and amortization, and capital expenditures.

55. With respect to MTS's *Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose: (i) the specific definition of cash flow used by MTS in this analysis, including the treatment of any stock-based compensation expense; (ii) CoLucid's basis for directing MTS to utilize a gross price per prescription ranging from $300 to $400; and (iii) CoLucid's basis for directing MTS to adjust projected revenue by a prescription volume achievement factor ranging from 80% to 120%.

56. With respect to MTS's *Comparable Companies Analysis*, the Solicitation Statement fails to disclose the individual multiples and financial metrics for the companies observed by MTS in the analysis.

57. With respect to MTS's *Comparable Acquisitions Analysis*, the Solicitation Statement fails to disclose the individual multiples and financial metrics for the transactions observed by MTS in the analysis.

58. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

59. The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement: (i) "Background of the Offer"; (ii) "Reasons for the Recommendation of the Special Committee and the Board"; (iii) "Opinion of CoLucid's Financial Advisor"; and (iv) "Certain Unaudited Prospective Financial Information of CoLucid."

60. The Solicitation Statement also omits material information regarding potential conflicts of interest of the Company's officers and directors.

61. Specifically, while the Solicitation Statement provides that "Lilly, CoLucid or their respective affiliates may enter into employment or other arrangements with CoLucid's management," the Solicitation Statement fails to disclose the timing and nature of all

communications regarding future employment and/or directorship of CoLucid's officers and directors, including who participated in all such communications.

62. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

63. The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement: (i) "Arrangements between CoLucid and its Executive Officers, Directors and Affiliates"; (ii) "Background of the Offer"; and (iii) "Reasons for the Recommendation of the Special Committee and the Board."

64. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to CoLucid's stockholders.

## COUNT I

**(Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)**

65. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

66. Section 14(e) of the 1934 Act states, in relevant part, that:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

67. Defendants disseminated the misleading Solicitation Statement, which contained statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under

which they were made, omitted to state material facts necessary to make the statements therein not misleading.

68. The Solicitation Statement was prepared, reviewed, and/or disseminated by defendants.

69. The Solicitation Statement misrepresented and/or omitted material facts in connection with the Proposed Transaction as set forth above.

70. By virtue of their positions within the Company and/or roles in the process and the preparation of the Solicitation Statement, defendants were aware of this information and their duty to disclose this information in the Solicitation Statement.

71. The omissions in the Solicitation Statement are material in that a reasonable shareholder will consider them important in deciding whether to tender their shares in connection with the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available.

72. Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

73. By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

74. Because of the false and misleading statements in the Solicitation Statement, plaintiff and the Class are threatened with irreparable harm.

75. Plaintiff and the Class have no adequate remedy at law.

## COUNT II

**(Claim for Violation of 14(d) of the 1934 Act Against Defendants)**

76. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

77. Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

78. Rule 14d-9(d) states, in relevant part:

Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

79. The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

80. Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and misleading.

81. The omissions in the Solicitation Statement are material to plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

82. Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### (Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Eli Lilly)

83. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

84. The Individual Defendants and Eli Lilly acted as controlling persons of CoLucid within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of CoLucid and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

85. Each of the Individual Defendants and Eli Lilly was provided with or had unlimited access to copies of the Solicitation Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

86. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly connected with and involved in the making of the Solicitation Statement.

87. Eli Lilly also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Solicitation Statement.

88. By virtue of the foregoing, the Individual Defendants and Eli Lilly violated Section 20(a) of the 1934 Act.

89. As set forth above, the Individual Defendants and Eli Lilly had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

90. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

91. Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment and relief as follows:

A. Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(e), 14(d), and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 3, 2017

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
(484) 324-6800

**MATORIN LAW OFFICE, LLC**

By: */s/ Mitchell J. Matorin*
Mitchell J. Matorin
18 Grove Street, Suite 5
Wellesley, MA 02482
(781) 453-0100

*Attorneys for Plaintiff*